The Honorable. The United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. James Stewart-Carrasquillo, appeal number 182247, and United States v. Harold Escalin Montañez, appeal number 191008. Okay, I want to just begin by on behalf of Judge Selye and myself welcoming Judge Katzmann from the United States Court of International Trade who's sitting with us this morning. We're grateful for his willingness to do so. Judge Dominguez, you may start your, I mean Attorney Dominguez, you may start your. Good morning, Your Honors, and may it please the Court. My name is Maria Dominguez. I represent appellant James Stewart-Carrasquillo in this case, and I'd like to start with the Court's indulgence by just briefly making reference to the facts in this case, and I do so because the facts are very important. In the early morning hours of December 10th in the fishing town of Naguabo in the east eastern part of Puerto Rico, my client James Stewart-Carrasquillo set out on a fishing trip that would forever alter his life. He had simply been asked to join that trip just hours earlier on the afternoon of the prior day. He was accompanied by two other men. One was co-appellant Harold Escalin Montañez, and the other one was Juan Carrasquillo Soto, who pled guilty in this case and did not appeal and is not the subject of these proceedings. The purpose of the trip was to lay approximately 20 lobster traps at sea. After the traps were laid, the trio began their trip back to the shores of Naguabo. The outgoing trip was uneventful at large, but on the return home, a serendipitous event altered their course and forever changed James's life. Mr. Carrasquillo testified at trial with respect to the events that transpired on the return voyage. He explained that Carrasquillo Soto saw in the water some fish. He directed James and Harold to assist him. Mr. Meese, I don't want to get you off track, but you don't have a huge amount of time, and I think we're pretty familiar with the record in the case, so if you want to get to what is the basis for the, you're bringing a sufficiency of the evidence challenge? Yes, your honor, sufficiency of the evidence, and I'm sorry. What's missing? What is the reason for concluding that there's not sufficient evidence here? Sir, there were three people on board that boat. The jury only heard the testimony of James Stewart Carrasquillo as to what transpired. Now, he claims he had nothing to do with bringing those bales on board, and if you can imagine his dilemma, your honor, he is on board a boat where he is miles from shore, and contraband is being brought on board that boat by the owner and captain of the boat, Carrasquillo Soto. But counsel, excuse me, he's also identified by one or two police officers as being one of the people who, upon sighting by the police, attempted to discard the bales and throw them back into the water. You are correct, and I was just getting to that. Well, but isn't that a problem on the sufficiency of the evidence, your claim that he's not part of the venture? I don't believe so, because I think that the testimony of Officer Del Valle is wholly incredible. That is the only piece of evidence in this case that links James Stewart Carrasquillo to the drug loading and the drug transaction event. And why isn't that a jury question for the jury? Because I think that the testimony of this officer, no reasonable juror could have found that those facts were correct or were true. What did Officer Del Valle say? He testified, judges, that approximately 113 feet, which he estimated to be twice the length of the courtroom used by this very court for oral arguments in El San Juan, he was able to distinguish two of the three men that were allegedly throwing bales overboard while they were dressed in water resistant gear that covered much of their face and their entire bodies from a distance of 100 feet. Counsel, didn't you make this argument in closing argument? I did. It was not accepted by the jury. Apparently, it was rejected by the jury, but mechanisms do exist in the law to correct miscarriages of justice because juries don't always get it right. And in this case, I believe that they got it very, very wrong. Counsel, let me ask you another question. There were only three men on board. The testimony, as far as I can tell from the record, everyone agrees that Carrasquillo Soto was captaining the vessel. So if the police officers saw two men discarding the bales, the only two men who weren't engaged in actively captaining the boat were your client and his co-defendant. Your Honor, I want to put this in context. This was not a large vessel. It was a small fishing vessel. It does not take a lot of skill to captain this boat. It was a Yola type vessel. It's not a fishing boat. Is there any evidence that the boat at any time was in the open water with no one at the helm? No. At the time that the bales were being brought on board, it was anchored. I'm talking about when the bales were being discarded. Well, there was no testimony about that at all. And the boat was moving at the time, wasn't it? It was moving. Yes, it was moving. But my point is that this type of a vessel is easy enough to captain that it would not take much effort to simply throw a bale overboard with one hand. Did you throw 25 of them overboard with one hand? No, they weren't. Most of the bales were on board when it was interdicted. There were only a few bales missing. Does your argument depend on your client never having touched the bale? Our client testified that he never touched the bales, that he never threw any bale overboard. But I would say that the fact of throwing a bale overboard is insufficient to involve him in the entire drug trafficking venture. If you can imagine being interdicted by police and being caught red-handed with contraband, you had no business. That was not his account at trial? No, his account was that Harold threw one bale overboard and that he did not. That was his testimony. One other fact that I would like to highlight because I think that it is also very important. We presented the testimony of a witness, excuse me, the last name of Hernandez, who was the person that was actually supposed to go on that fishing venture. He suffered a sprained ankle. At the last minute, Cajasquillo Soto asked my client just hours before the venture to attend. Hernandez testified that he actually loaded the 20 lobster traps on board the boat the afternoon before the venture. That calls into question whether this was actually a planned drug trafficking venture because why would they take 20 traps on board? Besides that testimony about the traps, was there any evidence of any traps ever found? Your Honor, the problem was that those traps are marked by a fish finder, the location, so that you can later go retrieve them. Our clients asked us to get the fish finder from the boat because we can prove where those lobster traps are, but the fish finder was lost by the government while the boat was in its custody. We were precluded from pursuing that lead. In closing argument, in an attempt to discredit Mr. Hernandez's damaging testimony, that is where the government referred to his broken ankle, which he did not have a broken ankle. Thank you. Thank you, Your Honor. Attorney Dominguez, you may mute your audio and video, and Attorney Herrera, if you could please unmute your audio and video and present argument to the judges. Your Honor, concerning my client, I must state from the beginning that the evidence is Herrena-Mendez again. Good morning, everyone. I represent Mr. Harold Esquilin-Montanez. The evidence against Harold is also insufficient to sustain a conviction for conspiracy to possess with intent to distribute and also a possession with intent to distribute the cocaine found in the boat. A different aspect between my client and Harold and Mr. Stewart is that my client, the testimony of Mr. James Stewart, is that my client pushed. He didn't say that he threw the bales overboard, but that he pushed them in an act of nervousness. He was nervous, and they were scared at that moment, and in the rush of the moment, apparently when the police was approaching the vessel, Mr. Juan Carrasquillo, the owner of the boat, shouted, throw the bales, throw the bales. Harold, who was described by Jane as a nervous individual, who was already scared, pushed one of the bales, and those bales were attached to each other. They were tied with some kind of rope, and when he pushed one of them, the other two or three went overboard. That was all that happened. Counsel, isn't the question of whether he threw them, as the police witness said, isn't that a classic question for the jury to resolve? I think that it was the kind of determination that a court of appeals should look at, because we are talking about a testimony of Agent Del Valle, the police officer who testified for the government, who said that when we approached the two individuals, and he was asked during the interrogation how they were, how was their reaction, it was very shocking that he said they were surprised, and that testimony corroborated the version that Harold was scared and was nervous at the moment, and besides that, your honor, how... Five minutes remaining. Another issue, your honor, is that Mr. Harold Esquilin was, when we see the evidence, has no any involvement in any planning, any conversation, any kind of meeting with Mr. Juan Carrasquillo, the owner and captain of the boat. He was just described as a mechanic, a recreational fisherman, a fisherman that in some time had gone fishing with Mr. Stewart and who once worked with Mr. Juan in his construction business, and additionally, your honor, I want to point out that the factors in this case does not support any finding that there was any kind of intention to distribute. These are specific intent crimes, and we can see that in this case there was no any fingerprints, there was no walkie-talkies, millions of communications inside the boat, no cell phones, there was no audio scan prepared, there was... Was there any evidence on the boat that suggests or is that would corroborate the account that they were there to set lobster traps? You know, the problem with that was that as a result of the negligence of the... I'm just saying, was there anything on the, I understand about the fish finder, was there anything on the boat that would suggest they were there for a lobster trap setting trip? At that time, no, your honor, because at that time they had already laid out the lobster traps in the sea, and we weren't able to retrieve that agent who did not preserve the evidence, and he was lost. So we didn't have that great opportunity to present to the jury the traps, and that will have made a big difference in this case. Another factor that is missing here, your honor, we didn't see that the usual blue holdings or canvas to cover the traps. We didn't, the government did not present any evidence that there was a trap or someone there waiting for the traps to be transferred once they get to the coast, and so there is a completely lack of evidence of distribution in this case, your honor. Had it was just a mere bystander there who was trapped in the middle of the ocean in a very difficult and dangerous place where sharks are usually swimming in the area. So he had no choice but to stay there at that moment. Your honor, I just want also to say something concerning the video reenactment. We were denied under rule 403 to present the video reenactment of the scene. The government alleged that there were no substantial similarities, and I think that they are wrong. There were substantial, that both was of the same size, that we just wanted to present a woman, a woman of the same age of Mr. Juan Carasquillo, who was a young and tough construction worker, that he could have, that he could lift, put all the bales of the same weight inside the vessel. The court, the first circuit court of appeals, have stated in the case of Jusco versus General Motors, that has stated that the concept of substantial similarity is a flexible one, and that will vary greatly depending upon the facts. Counsel, what's the standard of review on that claim? It's an abuse of discretion, your honor. Right, and district court's discretion, particularly in a case where the demonstration you propose differs in certain material respects from the actuality, is quite broad, isn't it? I don't think so, your honor, because the situation is... Let me test that thesis. So, do you have a case you can cite to us where we held it was an abuse of discretion for the district court to refuse demonstrative evidence in similar circumstances, or analogous circumstances? No, your honor, I didn't find a case of... 30 seconds left. ...all the cases that I, that we saw, even the one that was cited by the government, were basically mechanical and lab issues. But the government, the Puerto Rican jury, will not have to get confused by that. We are islanders, we know how the open sea works, and they will have to make a fair evaluation and interpretation of what conspired, and there was not a possibility of confusion as to the video reenactment at that moment. That's time. Thank you. Thank you, your honor. Have a great day. Attorney Harina, please mute your audio and video. And Attorney Handel, if you could please introduce yourself to the court and begin. Sure. Good morning, your honors, and may it please the court, Josh Handel for the United States. Substantial and compelling evidence supported the defendant's willing participation in this drug smuggling scheme, and there is no reason to set aside the jury's verdicts to that effect. At the outset, everyone agrees that the two defendants here and one other man, Juan Carrasquillo, were intercepted by Puerto Rico maritime police in the early morning hours while speeding toward the coast with over 1,200 pounds of cocaine aboard their vessel. So the first step of the two-part inferential framework that this court adopted in United States versus Guerrero, specifically that the vessel was engaged in Mr. Stewart himself testified, it was obvious to everyone on board that these bails contained contraband. So on top of those undisputed facts, the jury received consistent testimony from both Agent Del Valle and Sergeant Diaz that they had witnessed two of the boat's occupants frantically dumping cargo as the police approached, while the third occupant remained at all times at the steering wheel operating the vessel. That recollection shared by both testifying officers is consistent with Mr. Stewart's testimony that Juan Carrasquillo, as the only one who knew how to operate the boat, was at the captain's wheel as the police approached. So as I believe Judge Selya pointed out, it's undisputed here that there were only three people on board and that one of them was captaining the vessel at the time of interdiction. And that means that the consistent testimony from Agent Del Valle and Sergeant Diaz that two people were at the side of the boat throwing bails into the sea necessarily implicated both Stewart and Escaline, regardless of how accurately Agent Del Valle could make out their faces as he approached. And the fact that Stewart and Escaline participated in those frantic efforts to avoid discovery of the cocaine is alone sufficient to establish the second step of the two-part Guerrero inference, which is that each defendant was ready to assist in the criminal enterprise. That's for two reasons. First, this court has held that even ancillary services performed to advance the conspiracy's objective of avoiding police detection are sufficient for a reasonable jury to find that the defendant, in fact, intended to join the conspiracy and advance its goals. That was the holding of United States v. Paz Alvarez, which we cited on page 26 of our brief. Second, and more specifically in the maritime drug trafficking context, this court in 2015 affirmed the convictions in United States v. Peña Santo against a similar mere presence defense on the basis that, quote, once the individuals on board the Yola detected that they had been spotted by law enforcement, they started moving erratically on the boat and multiple crew members started throwing the bags of narcotics overboard. So that constellation of facts, the presence of a massive quantity of drugs on board a small vessel manned by only three people, the circumstances under which they were intercepted, racing back to shore in a known drug trafficking corridor during the early morning hours, and the consistent testimony of law enforcement officers that Stewart and Escalin were the ones frantically dumping the cocaine overboard while Carrasquillo captained the boat, is absolutely sufficient to sustain these convictions under this court's inferential framework in Guerrero. Turning to the trial errors that the defendants have asserted, I think that the district court acted well within its discretion both in denying admission of their demonstrative aid and in the instructions it gave the jury following closing argument. Counsel, can I ask you a question on the so-called reenactment evidence? In the criminal context, you cite a case from the Sixth Circuit, the Baldwin case. You cite a First Circuit case, Fusco, which is a civil case. Is there any First Circuit criminal case directly on point regarding reenactment videos? I was not able to find a First Circuit case directly on point regarding reenactment videos in the criminal context. The closest I could come was patching together the First Circuit precedent from the civil context and then the out-of-circuit precedent from the criminal context. Certainly, we were not able to locate any case finding that a district court had abused its ample discretion in denying this kind of a demonstrative aid on the basis of allowing that it was in the civil context but still under the same federal rule of evidence. This court warned that jurors may be misled because they do not fully appreciate how variations in the surrounding conditions as between the original occurrence and the staged event can alter the outcome. Consequently, the trial judge enjoys great discretion in this area. That discretion was appropriately exercised in denying admission of the reenactment video here. There was a reference by your opponent's counsel that there was a misstatement at trial by the prosecutor regarding the condition of the ankle of one of the passengers. Could you just address that? Sure, absolutely. This concerns the prosecutor's inadvertent misstatement during closing argument that defense witness Hernandez had suffered a broken ankle rather than a twisted or sprained ankle. Here, I think there's no abuse of discretion in the district court's instructions to the jury. In any event, no conceivable prejudice could have resulted. As a threshold matter, no one has suggested that- Was that objected to at the time? It was, your honor, yes. Mr. Stewart's counsel did preserve an objection to that misstatement along with two other parts of the prosecutor's closing remarks, but she didn't ask the court for any particular relief at that time. She didn't move for a mistrial or request a curative instruction or ask for anything to be stricken, but she did object after the prosecutor had finished his argument. What was the district court's response to the objection? Right, so the district court denied the objection, but the district court did shortly after closing arguments concluded and Mr. Stewart's counsel had raised this objection, the district court reminded the jury that it was their recollection of witness testimony and evidence rather than the attorney's characterizations of that evidence during argument that controlled their fact-finding during deliberation. As we know from Supreme Court precedent, jurors are presumed to follow their instructions and there's no reason to think that they disregarded that one. And I do want to talk about prejudice on that last point because I think even if the prosecutor's misstatement had somehow caused some confusion about the extent of Mr. Hernandez's injury, that kind of tangential aspect of his testimony at most goes to the question of whether Hernandez was able to help Carrasquillo load lobster traps and the government's trial was agnostic as to whether there had ever been lobster traps on the boat. A witness... With respect to the question whether there were lobster traps on the boat, is there anything in the record that is supportive of this notion that the fish finder was lost and that's why they couldn't retrieve the lobster traps? Is that in the record? I believe that is in the record, your honor. I don't have a record site for you for that proposition, but yes, I do believe that the fish finder, if I'm remembering correctly from the record, I believe the fish finder was listed on an inventory of the boat after it was seized. Or when I say fish finder, there's a GPS device that was listed on an inventory. And then no one can find it even though the government seized it in the inventory? I believe that is correct, your honor. Yes, based on my reading of the trial transcript, it certainly was not adduced as evidence during the trial. But I do think there are other pieces of evidence here that suggest that there probably were not lobster traps ever on that boat. We do have the absence of any other lobster fishing equipment on board the boat when it was seized. And the fact that Mr. Hernandez testified that Mr. Carrasquillo's boat was not equipped with a winch, which is a device necessary to pull lobster traps up, and that it exhibited none of the wear and tear on the sides of the boat that would typically characterize a boat used for lobster fishing. So the jury had significant evidence in front of it that this boat was not actually used for lobster fishing. But again, I do think the government's theory at trial was somewhat agnostic as to whether there were lobster traps. Counsel, did the jury hear evidence that the fish finder had been seized by the government and was no longer to be found? Yes, your honor, I believe. And I apologize. I was not trial counsel. So if either of my friends on the other side can correct me on this if I'm wrong. But I believe that defense witness Manuel Valentin testified to that. Yes. Okay. And was any instruction requested based on that by the defense? I don't believe so, your honor. No. But again, you know, kind of getting back... Five minutes remaining. Thanks, Sam. We do have a witness for the defense, Manuel Valentin, who testified that lobster traps can be used as a disguise for drug traffickers smuggling cocaine over water. The prosecutor circled back to that testimony and emphasized it during his closing argument. And even Mr. Stewart's counsel acknowledged in her closing argument that Mr. Valentin had testified that using lobster traps to disguise drug trafficking activity is a tactic that is commonly done. So at most, we are talking about substituting one inculpatory inferential chain for another here. And I certainly don't think that's the kind of prejudice that warrants baconer of these convictions and remand for a new trial. Unless the court has further questions, I'll rest on my brief and respectfully request that you affirm the judgment below. Thank you. Thank you. That concludes argument in this case. Attorney Dominguez, Attorney Harina, and Attorney Handel, you can disconnect from the meeting at this time while IT pauses our recording.